All right, the next case we'll hear this morning is West Virginia Rivers Coalition v. Chemours Company. And Mr. Kadam, whenever you're ready, we'll hear from you. Thank you, Your Honor, and may it please the Court, Alon Kadam for Appellant v. The Chemours Company. A preliminary injunction is an extraordinary remedy. Here, multiple overlapping errors require reversal of the injunction issued below. Counsel, I hate to ask a question 15 seconds in, but I just want to clear two issues off the table to see if they're here. And then you can go to the arguments. I didn't see these in the briefs. Is there any question or did your client make the argument below that a private suit was improper because the government was diligently prosecuting the permit violations? I don't think that argument was made. Okay. Are there any Dahlberg challenges to the expert testimony that were made and preserved below? None that have been raised on appeal. Okay. Thank you. Go ahead. Among the overlapping errors, plaintiff's sole identified member, Ms. Robinson, stopped drinking the affected water years before the alleged violations and has disclaimed any intention to resume regardless of what happens to the violations. The district court presumed irreparable harm and did so primarily based on supposed harm to the public. The court also confused the substance at issue, HFPODA or dimer acid, with a far different substance, PFOA, which is not at issue. And all sides agree that the permits were issued in order to protect human health by keeping concentrations of dimer acid below 140 parts per trillion, a level that has never been exceeded, not even once. Because plaintiffs have not established irreparable harm or even standing, this court should vacate the injunction, sending it back so that EPA can address any remaining compliance issues in the first instance through an administrative process that is already well underway. Do we have to decide, do we have to talk about standing first? That sounds like a silly question. You always have to talk about standing first. But this is on an appeal from a preliminary injunction. And my understanding is that the plaintiffs have changed since the preliminary injunction. There's a new plaintiff, um, has been allowed to intervene, things like that. So there's kind of a separate question of whether there's jurisdiction over the lawsuit, which is not really the question before us, whether we have jurisdiction or the district court does. But instead, this, the predictive question of, for a preliminary injunction, at that time, did the district court have reason, you know, did it seem likely that this particular individual would have standing? Um, is that jurisdictional or does that just go to whether the injunction, whether the court was justified in, in granting the injunction? So I think there are some overlapping issues. The basis both of standing for the sole plaintiff in whose, uh, behalf the injunction was issued was Ms. Robinson. We can talk about her. And also irreparable harm supposedly to Mrs. Robinson was part of the analysis. Right. And our irreparable harm analysis has to look only at her because these other plaintiffs or other named, newly named individuals were not part of that analysis. That is not the basis of the injunction that's before you in the appeal. Right. That's correct. But for standing, we just have to be satisfied that like now we have jurisdiction, um, not necessarily, do we have to be satisfied that Mrs. Robinson had standing at a particular moment in time? I think you do because relief has to be granted on the basis of standing. Standing has to exist at the time that a court issues relief. Right. And so if there was no standing because Ms. Robinson didn't have standing at the time, the fact that they've now introduced some other member who, you know, we don't accept that these new members might have standing on their own right, but even assuming that they did, it would still not be a basis for having granted the injunction that's in front of you. But if there were no, if it was just a standing issue, we'd send it back for the judge to then say, well, these other individuals have standing and I'm reimposing the injunction. I mean, it seems like we should address the merits of the injunction. So I think there is very much that concern that if you just threw it out on standing basis without saying whether it would have satisfied reparable harm, that the district court might go ahead and impose the same injunction, which would obviously lead us into the same predicament that we're at at this point. So starting with standing, Ms. Robinson made clear that she stopped drinking the affected water years before the permit violations that are alleged to provide the basis for this injunction. She was also asked repeatedly whether she would go back to drinking the water, assuming that the permit violations stopped and made very clear that she wouldn't. And I think it's useful to sort of provide the framework that the Supreme Court and this court have followed in cases where standing is supposedly predicated on avoidance, reasonable avoidance of water or an affected area. And they always have at least three elements. First of all, you have... Does that cover her claim for recreational use? Yeah. So recreational use wasn't at issue in the district court's opinion other than the sort of aesthetic value of knowing that there were permit violations. But I think in terms of standing, haven't we recognized that in connection with pollution cases? Yeah. So we can talk about her sort of late-breaking argument about boating, which I think has the same feature, but it's all in the sort of nature of avoidance. Well, you have a late... Y'all both have late-breaking arguments. Fair enough, Your Honor. I may be a little careful. Fair enough. I take the point. So all of these cases, you look at lay law or this court's decision in gas and copper, you have, first of all, someone who regularly uses the affected area or the affected water often daily. Then you have essentially a clean break where they stop doing so and they say, the reason that I stopped is because of the violations. And then third, there's a declared intention and a plan to go back to using it after the violation stopped. With Ms. Robinson, you have none of those. She wasn't using... She wasn't drinking the water, rather. But to... Why don't you focus on Judge Niemeyer's question about boating? That may be... Sure. I don't mean to say they don't have other arguments. No, no. Understood. And just one point about boating before I get into the reasons why it's deficient. That wasn't part of the irreparable harm finding from the district court. So it wouldn't...  Stay away from irreparable harm. Sure. I may be wrong on this, but I'm treating standing, which is sort of a person, whether he's in the right position to make a claim, as opposed to the necessity for an interim injunction. Sure. So with respect to boating, we don't have any of the three features I just identified. She didn't claim that she did it regularly. She was equivocal about how many times she did it. It sort of seemed from her deposition testimony that maybe it was one time she said, there was someone driving the boat, I think. When she was asked when it happened, she couldn't remember whether it was in the last 10 years. She couldn't remember whether it was before 2011. That's at page 1582 of the joint appendix. So that strongly suggests that she had stopped at some time well before the alleged permit violations. She also didn't say that the reason she stopped is because of discharges of HFPODA specifically. She just said, because the river is polluted. And in fact, when she was asked the last time she used it, she said, I know that there was C8 in the river. C8 is a reference to the other chemical, PFOA, which she, in her declaration, attributes to the cause of her preeclampsia. And so I think all of this raises a strong inference. Number one, she wasn't using it regularly for boating. Number two, there's no allegation that she specifically stopped because of these permit violations. Does it really have to be regularly? I mean, there may, obviously, you have a case like the Laidlaw where there is more regular use and comparing it to that, it's sure less. I'm not disagreeing with you there. But a little bit of standing is all it takes, right? So, I mean, it seems that we got to be a little careful. I mean, I think we need to know it is concrete enough. So I appreciate your talk. I think those points are fair, but the fact that it's not as regular isn't necessarily determinative, is it? Well, let me put it in sort of broader context. Laidlaw was itself an innovation in the law. There was the dissent by Justice Scalia who said, you're going to make it trivially easy because you're just going to have people who say, I use the affected area regularly and I would go back to doing it. This court in Gaston Copper assimilated Laidlaw in a case where there was also essentially daily use. So there was someone, Mr. Sheely, whose pond had been polluted by the affected water and he said, I fish in it and I drink, I fish in it regularly, I go swimming regularly. My kids use it during the summer, essentially every day. He also said that his property values were directly being affected. So and even in that case, there were some concurrences that said, look, we have to follow what the Supreme Court has said, but we think that this is lowering the standing bar well below what it used to be. So I think that there's a good reason. Well, we may have, but, you know, we might. So I think even if you accept fully that the standing bar has been lowered in the respect that Laidlaw and Gaston Copper recognize, I don't think someone who at one time she can't remember when, maybe 10 years before, possibly boated on the river, has no concrete plans to do it again, and in fact, likely stopped for reasons unrelated, that that's enough to get you standing further. I mean, does our modern notion of injury impact, you know, traceability and redressability have any support at what case or controversy meant at founding? I would say that they do. And I would point to Supreme Court decisions that talk about this and explicate it, things like the Spokio decision that talk about not just the particularity requirement, but a concreteness requirement that looks at sort of the risk to a particular person. You know, some of that is just case law principles. Some of that is derived from the sort of case or controversy requirement we inherited from English common law. You know, I have essentially just taken as a given that these are core requirements that there's Supreme Court requirements, so that's probably a fair way to go about it. That just feels like, yeah. So I think Judge Niemeyer pointed out that a question of standing is, who's the right person to bring this suit? What about her, the inaccess to water, is that enough to give her standing? So I think if she would otherwise be drinking the water, that would be one thing. But she has made clear, she stopped drinking the water years before the violations and has no intention to go back, regardless of what happens with it. And this is, I think, the point that brings all of this together. There are a lot of people in this water district who do use the water. There may even be some who would drink the water but have stopped doing so, but because of these violations. The fact that plaintiffs have not identified anyone in that position just underscores the weakness of their case. It's not a reason to relax the standing requirements, much less reparable harm requirements. Can I ask a question that may not matter as much because of other aspects of their standing? But one of the avoidance principles that the law talks about is the avoidance must be reasonable. Correct. And it looks like the briefing on that involves the testimony of experts. And just as a fundamental matter, does it have to? I mean, you know, if the water, you know, looked nasty down from, you know, the plant, I know this chemical, it doesn't have color or smell, but, I mean, do you really need It doesn't seem to me that you need expert testimony on that issue. So the kind of battle of experts seems unnecessary on that point. So I think in the context of the reason you're avoiding it is because it smells bad or it looks really gross or it's doing something to your property values, I agree with you. You don't need an expert to say that it smells bad. But if you just hear there's a, I mean, there's a Clean Water Act permit and you hear it's being violated, Clean Water Act permit is, you know, generally to protect against bad things in the water. Why can't a person say, look, I'm just going to stay away from, I'm not going to drink it as long as I know there's, you know, a permit violation. That seems reasonable to me. So if a person who drinks the water would only have standing if they could point to some reasonable concern about their health, it cannot be that someone can just not drink the water unreasonably and manufacture standing. That just can't be the case. Fair enough. And to your point, there is a permit violation. I think this is really important. The permit issued by West Virginia was expressly based on a desire to set a level in the Ohio River for dimer acid of 140 parts per trillion. There has never been a measurement even close to 140 parts, not in the Ohio River, not in the aquifer, and certainly not in the finished tap water, which has been filtered, you know, multiple times. The highest finding has been 40. There has never been a finding above that in the Ohio River or downstream uses. And so insofar as we are taking the West Virginia Department of Environmental Protection as the authority on what is sufficiently safe for human health, they have said that is 140 parts per trillion. But are we allowed to do that? Can't we take the, they're alleging the federal standards, right? Right. So let me get into the federal standards because I think that's the way that they try and bring this in. In 2024, EPA issued a maximum contaminant level goal of 10 parts per trillion. And starting in 2031, public water systems under the Safe Drinking Water Act will have to ensure that their water meets that. But what they said is, and I'm just going to read from, I'm just going to read from what they said in the Federal Register. It is the daily exposure to the human population, including sensitive subgroups, that is likely to be without an appreciable risk of deleterious effects during a lifetime. So it has a couple features that are really important here. And this is important in part because plaintiff's expert was very explicit that the reason she said 10 is the limit is because of the MCLG. So number one. It would have been a great time to say Dahlberg applies here and you have an opinion that doesn't have any scientific basis, no testing, no peer review literature, and then you would have had a maybe even stronger argument on that. So I take your point. We certainly did contest the conclusion she tried to draw from the MCLG. Because number one, it says daily use. It doesn't mean one day. It means every day. The trouble with it, you contested it on its persuasiveness and you got an opinion in there that may be not, I'm not saying it is. It may be totally valid. But if it's, you know, got some problems, you know, and you got two competing evidence, now I don't know that that ultimately matters here because on the injury, on the violation, you still have the drinking water that she's not drinking anymore. So it may not come down. But it seems like the evidentiary posture is two expert opinions, neither of whose admissibility is challenged and the district, you give a district court, you know, a lot of leeway when you're in that situation. So respectfully, I think at the point where she says, I'm not doing my own testing and I didn't come to 10 because I've independently determined that that's what the literature says so much as I am resting it on the MCLG, this is what she says. One time, one day, that's what the MCLG stands for. And then later, according to the MCLG, it's one day. And so in that situation, when the MCLG on its face makes clear it's actually talking about daily use for a lifetime, which EPA defines as roughly 70 years, it is simply not credible for someone to say one sip on one day causes a significant health risk, even for someone unlike Ms. Robinson, who actually drinks the water. I see that my time is expired. Thank you. All right. I guess we'll hear first from Mr. Tini. Good morning, Judge Niemeyer. May it please the court. Counsel. My name is Derek Tini and I appear here on behalf of the Plaintiff Appellee West Virginia Rivers Coalition. Judge Goodwin's findings on standing and irreparable harm are factual findings, as Judge Quattlebaum was alluding to. They were not clearly erroneous based on the record as a whole. He heard two disputing positions offered by experts whose qualifications were not disputed and whose methods were not disputed. Well, he didn't. I mean, you had, you alleged standing from avoidance of the water and your client, we're on standing and before the court's order was issued, your client said that if the violations were fixed, I wouldn't drink the water. So how do we have a redressable injury? Redressability has never required that kind of but-for analysis. There are multi-polluter cases and even Comores acknowledges this in their brief, that when there's a multi-polluter case, that if one type of violation ceases, it's reasonable to continue to avoid because there are other violations. Although this may not be a multi-polluter case, there is record evidence and even the standing declarant knew this. It is my understanding that PFOA and HFPODA have been released into the environment through water, soil, and air releases and deposition. What that means is through Comores' stacks, these chemicals are emitted and Comores' own witnesses testified to that and the problems that they have because of storm water because these things are precipitating all over the community. If you were to stop the violations at the end of the pipe, that does not render her water clean. In this way, that's like this court's decision in NRDC versus Watkins, where this court expressly held that we don't have this kind of but-for causation or but-for redressability. In that case, there was a nuclear reactor and it would start and stop. I'm sorry, it looked like you may have a question. Yeah, just to follow up on that, I mean, you know the record better than me, so if I get this wrong, please correct me, but accepting that there's different ways other than the actual emission from the outlets that would be stopped, there may be lag time from these other sources, right? But, I mean, I don't think anyone has said that, you know, even if there are other issues with the emissions, if the permit violations, let me, so you're, as I was saying, I'm correcting myself, you're saying that there are, that the water can be polluted by things that were not permit violations? Yes, Your Honor, I am. And you're saying that we can enjoin a permit violation if the violation of the permit is not redressable, if something that's not the violation of the permit would cause someone to not drink the water? Yes, we are, and here's why. And I think that the Massachusetts versus Environmental Protection Act case that the Supreme Court decided is what makes this clear. Redressability does not, never has to be a silver bullet. That case, Massachusetts versus EPA, involved climate change and a specific issue about the regulation of vehicle tailpipes. I don't think there's any dispute, no matter which side of the climate change, you know, debate you may be on, that regulating tailpipes is, you know, not going to solve global warming. And so if the injury is a potential global warming, and doing nothing about the tailpipes isn't going to solve global warming, well then how is that redressable? You're talking about an avoidance type of standing. Yes. Doesn't it depend on the type of standing you assert when you're looking at that? I don't think so. I think that avoidance is a type of injury, and let me take a step back because I think this focus on the drinking does ignore the fact that she is exposed to this water daily when she takes a hot shower. But your expert said she could not say would cause any harm. Well, she said that when she was first asked, without the declaration in her hand. But that gets cleared up on cross-examination, and in the... I assume I don't think... Do you have any basis for that, other than your expert's testimony? Because I've read the testimony, I've looked at it, and so I'd love to hear your thoughts. I'm not trying to cut you off, but do you have anything besides Schlesinger on that? Because I thought she pretty clearly did not support an expert standard for that theory. She is later asked by the court directly whether this individual who has previous C8 exposure, and that is a big part of Dr. Schlesinger's conclusion, is because she's carrying a body burden, because you might think of her as an eggshell plaintiff. And so therefore, because of those circumstances and the fact that she lives there, she said unequivocally, and this isn't challenged on their brief, that it is harmful for Ms. Robinson to have even a single exposure over 10 parts per trillion. That's... That was... That... In the... I was pretty sure... I'll look back, and, you know, that's a factual matter as to what's said. I understand. If that's your argument, I'll double-check that. I thought that they, the district court, went in and said, does this change if she says she stopped drinking the water, or something to that effect, and she says, I haven't considered it with that in mind. So, there are... That comes before this later interruption by the court, at page 1341, is the dialogue I was talking about. Keep going. I'll look at that. Sure. Before that, yes, she did say, I cannot come to a conclusion. But then, defense counsel put Ms. Robinson's declaration in her hand, allowed her to review it, and then she came to that conclusion. What you're witnessing in the transcript is her refreshing her recollection of the circumstances that she could not draw a conclusion on in the immediate colloquy with the judge. But in response to a later colloquy with the judge, she says, unequivocally, that there would be harm. And that is the type of... Because that's supported by the record, that's the type of factual finding that would have to strike this court as wrong with the force of a five-day old, refrigerated dead fish. Yes, ma'am. Yes, ma'am. 1341. You might want to check that when you come up on Roe. Oh, okay. Well, I'll look at it right now. I apologize. I want to make sure I get that right. I mean, I don't want to take your time here, but... No, no. I wouldn't come up on cross with any other number. This starts with... The court starts at line eight, but, and I'm going to quit, but taking this particular lady, Ms. Robinson, who, as you say, lived there and had blood levels from the C8 studies, is an exposure that's measurable and exceeds ten parts per trillion, I forget what my question is, harmful? Yes. And that follows that interchange where the judge asks her specifically, and that would be at page 1333, where she says, in response, I cannot come to a conclusion based, because I don't, I don't know what her, the contribution of brushing her teeth, what the relative would. She didn't have the declaration in her hand. She's given it. You're saying 1341 is very, is specific to not drinking, just bathing and brushing teeth and watering vegetables. I think that has to be what he means by this particular lady, because it's clear the court understands that she has avoided drinking and is only brushing her teeth and bathing and washing her dishes in this toxic stuff. To be fair, the witness didn't seem to know that until the court asked it previously, but the page before it, the witness clarifies she's testifying about PFOA and dimer acid together, right? Yes, but when the judge asks about ten parts per trillion, that is HFPODA specific. PFOA is a different standard. That would be four parts per trillion. The judge, who is there, watching all of this in real time, and I think she did realize she only brushed her teeth, but it's important. The court is the one whose knowledge is important, right? Because it's his factual finding. When he asked this question about the particular lady, he knows that she brushes her teeth and showers, but has avoided drinking it because of Camorra's discharges. He knows all that, asks her specifically about it, and the witness says yes. So for that reason, I think that there is clear exposure and evidence to support the factual finding that there is harm here, based on... What if that, assume it says what you say, I hope that didn't come across like I don't believe you. It does not, Your Honor. My dad's from Missouri, so I understand the show me part. For the sake of discussion, that's correct, but we can look on our... We were to look at this record and come to the conclusion that as a matter of law, that's an inadmissible expert testimony. That's a big assumption, too. Can we do that? I don't believe that's within the standard of review that this court applies on preliminary injunctions because you're going to have to assume a whole lot of things before you get there that the court never decided. For example, does Daubert apply in a preliminary injunction standard? It may feel like it absolutely does, but this court's case in Grimm and the Supreme Court case in Texas v. Kamenich suggest that there's a looser standard of preliminary injunction. All those cases really talk about affidavits. There's not hardly anything that talks about that would apply to expert witness. At the appellate court level, that is correct, but there are district courts who have taken that to conclude that Daubert doesn't apply. I won't be on the Daubert side issue anymore. You're welcome to be on whichever issue you would like, Your Honor. Can I ask you a little bit more about Schlesinger? She also said she couldn't quantify the increased risk. She's asked questions and says, yes, it would be harmful. One exposure would be harmful, but then when asked, well, what's the harm? What's the increased harm? She says, it's a risk. I said, well, what is the risk? She says she can't say how much the risk is. When we're talking about irreparable harm, how does that factor into your argument? This is not, I would not try to defend a risk of risk case. What she is saying is, I cannot quantify the actual harm that is occurring, which this court has recognized exposure as a harm in the Somerville case just last year, Somerville versus Union Carbide Corporation. I cannot quantify it because I don't have the tools to look molecularly to understand. She does know, can I, I'm sorry. Oh, yeah. I just, you know, you might, in each case, whether exposure is a harm, that's a big statement that is kind of a case-by-case analysis, right? Sure. To say exposure is a harm in every case would be to say the risk that something might happen from the exposure is the harm, and that can't be right. Fortunately, we don't have this case. Dr. Schlesinger testified, and pardon me for getting into the weeds, but she testified about PPAR-alpha. That is a receptor that is activated by this, and once that receptor is activated, the liver starts to make fat. It only becomes perceptible or diagnosable as fatty liver at some other level, but each exposure to HFP-ODA at greater than 10 parts per trillion causes that imperceptible or microscopic injury. It is an exposure with an actual harm inside the body. It's a bodily invasion that leaves a mark. Is it quantifiable or calculable? No, but it doesn't have to be to be irreparable harm. Let me ask you, what, the injunction enjoins Schmerz from violating the law. The law is emitting these toxics above the permitted level. What do you anticipate they would have to do? Well, the record supports that what they had done in a meeting... No, I'm talking about the injunction language. Yes, well... The injunction language is just a generalized saying, comply with the law, and so they have done that, they have exceeded the admissions, and they're now in an agency proceeding to adjudicate that or adjust that. And the judge heard all of those facts. I'm not talking about... I'm asking you... Yes. What are... What do you interpret that injunction to require them to do? It is not an obey the law injunction. It is not an obey the law injunction. That's not the basis of their challenge here. The language is, you shall stop your discharges that violate this permit in any means necessary, and the record here reflects the means. This got in before the injunction was issued, okay? I want to stick with the language of the injunction. Yes, sir. I want to understand what you think the defendant has to do. What I think the defendant has to do is what they actually did and are in compliance. They submitted before the court issued the injunction evidence that they had reduced their discharges by collecting various other sources of water and keeping them from going into the Ohio. So they were able to come into compliance. I believe, I'll proffer to the court that they're in compliance today, and they've not reduced production at all. So what the injunction led them to do... Are they in compliance today? As a result of the injunction, yes, they are. They have complied with the injunction. We have no qualm with their compliance. We aren't on a content proceeding. The court issued the injunction. They've been in compliance. But the compliance resulted as a result of this lawsuit, and they started treating additional waste streams, and that's... I wish I could remember the record number, but the court put... I'm sorry. The Comoros put that in the record. They put it before the court that they were treating air conditioner condensate that they had been dumping into the river. Because this stuff's in the air, there was a lot of it in the condensate. They stopped putting that in the river, and they have found a way to come into compliance. So I don't have to think about what it would take to come into compliance. We have the defendant's own explanation in the record before the injunction was issued. What's the status of the agency proceeding? The status of the... How would the injunction affect that? The injunction does not affect EPA's ability to bring them into compliance. Now Congress, first of all, this is not a preclusive action that EPA is taking. Comoros never raised that issue because it would not succeed on the merits. Congress gave ways for agencies to preclude citizen suits, and the agency never took advantage of them. But regardless, they can comply both with Judge Goodwin's order and with whatever the agency ultimately decides. That is still in a state of back and forth on approvals of what they're going to do. But what Judge Goodwin clearly said was, this community cannot wait for the bureaucrats to work out the solution. I am a federal judge. I see a violation of law. I see a concrete injury. That's exactly what the problem, I think, with this injunction is, as alleged by the appellants. In other words, he started with the fact that the law permit was being violated, and therefore it has to be enjoined, and that there's necessary damage as a result. And he talks about the whole community, he talks about the whole area, he talks about the environmental laws, he criticizes Winter, which is very strange, because the injunction is a very preliminary before trial remedy, and it's an extraordinary remedy. And so Winter requires a high level of compliance, and yet the judge sort of gave it the back of the hand. He said, how can you have a violation of law and not an injunction? And so he talks about downstream, he talks about Kentucky, he talks about all these other things, instead of focusing on the irreparable harm to Ms. Robinson. Your Honor, I don't think that's a fair reading, and here's why. He editorializes about Winter. There is no way for me to- I'm talking about how he treated- And then he says- If he talks about violations of the law, there's got to be injury. On JA 1625, the judge expressly said that wasn't what he was doing. His irreparable harm analysis does not rely solely on permit violations. He disclaimed that. I see that my time has ended. Can I finish my response? So yes, at 1625, he disclaims that whole premise, and then he goes on to make specific factual findings about harm to Charlize Robinson and the plaintiff. So his statements about harm to the public, about Kentucky, whatever one may think of those in compliance with Winter, that's harmless error because he complied with Winter in finding harm to this plaintiff based on the testimony that he heard live. Thank you, Your Honors. All right. Mr. Newman, do we hear from you? Justin Newman for Plaintiff Applee Little Hocking. We're the intervener that Judge Rushing talked about, and I wanted to make a couple of points. One, that Little Hocking, we are a Ohio water provider that was granted intervention in this case. We provide water to 12,000 people in Ohio. We sit directly across the Ohio River, about 1,300 feet from the Washington Works plant. And our production wells on the Ohio side of the river are designed to draw water in from the Ohio River. So below, we were granted intervention because, and the judge found that we had Article III standing because our water, as a result of these dimer acid violations, 2018 dimer acid was first discovered in our water at a level of 32 parts per trillion. Can you just remind me, were you granted intervention after this injunction was granted? We were granted intervention before the injunction was granted, but after the hearing. After the hearing. Yes. What is your relationship to the injunction? Are you a party? We are a full party to the case, yes. To the injunction. We are a preliminary injunction. Are we a beneficiary of the injunction? No. It doesn't address you, does it? Well, it does address us in one sense. One, that we are one of the downstream users who is suffering from increased dimer acid concentrations. And I think it would be fair to consider us under the Amoco case. And in fact, we've heard a statement today that was quite surprising that there was no, that the permit was set in order to make sure that no Ohio River water never got above 140 and that no downstream water supply was ever above 140. Little Hocking, again, right across the river from Chemours, started out at 32 parts per trillion and we're now at 870 parts per trillion. That was one of the reasons why we were granted intervention in this case. And so I think you can look at us for two reasons. One, we clearly have standing as an intervener and we'll be able to prosecute the case regardless to completion. And then I also think under Amoco, we're an example of environmental injury that is well above this 140 parts per trillion number that Chemours has said. But we, I mean, it sounds, we have an injunction order that's been appealed that relies for standing and irreparable harm totally on Ms. Robinson, correct? I think that is true on standing, not true on irreparable harm. I think the judge considered downstream water users... Well, he considered a lot of things. I mean, he considered the whole area. Well, he considered... He didn't particularly consider you as a party to the injunction, I didn't think. He did consider downstream water supplies and we are the most contaminated. Louisville is another one. Cincinnati is another one. And I do think that we are properly considered under the Amoco case, which is looking at environmental injury and the mother load of contamination that is in our aquifer as a result of these discharges is certainly... Maybe we think that's enough to be considered here. Maybe that is something that you should make in your own injunction motion. We'll have to consider that. I hear that. I do want to say that I just don't want the record to reflect that there's no water supply that's been affected over 140 parts per trillion because that's just not true. We're over five times that. So, thank you. Thank you. All right. Thank you, Your Honor. Just to make four quick points, starting with the representations my friend made about the record with respect to her toothbrushing. So, on page 1341, he points out that the court asks about exposure and the witness says, yes, there is harm. And he infers from that that this is a revision to the expert's statement about ten pages earlier where she was asked about harm from toothbrushing and said, I can't come to any conclusion. With respect, that's not a plausible read of the record. If you look at the immediately preceding page, the court asks, there's no safe amount of alcohol that you can consume, right? The witness says, yes. Is there a safe amount that is harmless of PFOA that you can consume? The witness talks about that. She says, are you asking about PFOA or HFPODA? The court, both. Yes, there is a safe level. So that is the immediately preceding discussion. It makes crystal clear they're talking about consumption, which was overwhelmingly the focus, presumably because the witness herself couldn't come to any conclusions about, you know, brushing teeth or taking a bath. The second point, my friend argues that there's no but-for standard of causation for cases involving multi-polluter cases. But then in his next breath, he admits this is not a multi-polluter case. So that really doesn't help him whatsoever. He brings up the Watkins case. And there, I think it actually strongly supports our argument. In the Watkins case, you had an avoidance case based on the same three factors that I talked to, that I referred you to earlier. You had someone who was using the affected water. In the case of one affiant, it was daily. They immediately stopped because of the violations, and they had a specific plan to go back. The district court then said, well, you haven't gone back. The plan has been shut down for two years. Doesn't that undermine your argument? And this court said two things. First and foremost, it said, well, it is undisputed, there's undisputed evidence that the damage caused by the violations persists for years. So we can't draw any negative inference from the fact that these people haven't gone back to it. And then second, it made some statements about causation, which were arguably dicta. But you still had the first two aspects of the standard that I talked about. You still had regular use leading up to the violations, and you still had someone who stopped because of the violations, immediately because of the violations, and attributed the change in behavior to the violations. We don't have either of those here. Ms. Robinson has said point blank, I stopped in 2018, years before the violations. She has also said, I will not go back regardless of what happens to the violations. And contrary to my friend, she never said it's because of some sort of concept of a lag time. There is no evidence about a lag time that would affect her here. She's never claimed that the reason I'm going to stop indefinitely drinking the water is because there is a lag time between the violations. It sounded to me like the argument was not just that there's a lag time. It was not really that there's a lag time in the violations and the ability to drink water. It was that there was some other pollution that didn't come from a violation of the permit that might have affected a decision to drink water. That's right. And I think that shows fairly clearly, number one, there's no causal connection between the violations and her change in behavior. And number two, there's no addressability because no matter what happens with the violations, she's still not going back. Not because of dimer acid, but because of a different chemical, PFOA. To your point, Judge Niemeyer, I think it is deeply troubling what the district court said about presuming irreparable harm and the fact that he based the injunction primarily on supposed irreparable harm to the public. And even if you disagreed with us about everything else, if you agree with us on this point, it still requires vacating the injunction. Because an injunction is supposed to be an exercise of discretion and a balancing of factors. And the district court put something on the balance that is plainly inappropriate. Finally, on the question. In a bigger picture, and both parties seem to recognize this, is that a preliminary injunction is a temporary order to preserve things or mandate certain conduct temporarily on a strong showing pending trial. And the question is, is there anything that needs to be done here before trial based on the circumstances of Ms. Robinson?  And based on the circumstances of Ms. Robinson, who's not affected in any way, we would posit the answer is no. Talking more generally about the public. First of all, EPA and West Virginia have all sorts of emergency authorities that they could use and could have used if they thought it was merited. Instead, and if I could just finish this point. Instead, they've been engaging since before the suit. I'm sorry. I think yes, actually, before the suit, certainly before the injunction. They've been engaging on an administrative order on consent process through which Comores is making all sorts of adjustments. They are also undergoing a new permitting process that will include standards that are at least as stringent. That is the normal way Clean Water Act violations are supposed to be addressed. So, so why then is there, and I know we're over time, I probably shouldn't raise this, but I was intrigued by the first question I asked about the diligent prosecution issue. Does that apply here? I mean, I know you did say you didn't make that argument. We can't, we're not, I'm not going to decide something. Yeah, but I just was, I'm surprised given what you just said that that's not something that is in this case. Yeah, so I think what we would say is the Clean Water Act does not displace the normal winter standards for when an extraordinary remedy of a preliminary injunction should issue in an unusual case. But what the Supreme Court said in the Weinberger case is, the provision, meaning the Clean Water Act, makes clear Congress did not anticipate that all discharges would be immediately enjoined. Consistent with this view, the administrative practice has not been to request immediate cessation orders. Rather, enforcement actions typically result by consent or otherwise in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation. So that is the sort of normal way the process is supposed to play out, absent some extraordinary circumstances, which are certainly not present here. Thank you. All right, we'll come down to greet counsel and adjourn court for the day. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Paul V. Niemeyer, A. Marvin Quattlebaum Jr., Allison J. Rushing